Filed 6/4/15  P. v. Magallon CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>MISTY MAGALLON,<br><br>　　Defendant and Appellant. | 2d Crim. No. B256259<br>(Super. Ct. No. NA090693)<br>(Los Angeles County) |

A jury found Misty Magallon guilty of first degree murder.  (Pen. Code, §§ 187, subd. (a)/189.)  The jury also found true the allegation that she personally discharged a firearm in committing the murder.  (*Id.*, § 12022.53, subds. (b)-(d).)

The trial court sentenced Magallon to 25 years to life on the murder and a consecutive 25 years to life on the personal use allegation, for a total of 50 years to life.  The court awarded 902 days of actual custody credit.

We modify the judgment to add two additional days of custody credit and affirm it in all other respects.

FACTS

On November 20, 2011, Ramon Ruvalcaba was at home at approximately 3:00 p.m. on a rainy day. He heard three gunshots. As he walked toward the back of his home, he heard five more shots. As Ruvalcaba looked out the window of his home, he saw a person wearing a gray hooded sweatshirt standing in the alley. The sweatshirt had no logo on it. The person had one arm extended as shots were being fired. Initially, Ruvalcaba could not tell whether the shooter was male or female. He did not see anyone else in the alley.

The shooter ran down the alley toward Ruvalcaba's home. From a distance of 20 feet, Ruvalcaba could then see the shooter's face. He recognized the shooter as Magallon, a woman he had seen in the area at least twice a week. She had a semiautomatic handgun in her right hand.

Magallon had her hair pulled back into a ponytail. Although, her tattoos were not visible at that time, Ruvalcaba knew from seeing her on prior occasions she had tattoos of lips and a "W" on her neck. Ruvalcaba later identified Magallon in a photographic lineup.

When the police arrived, they found Richard Rodriguez on the ground in the alley between a van and an apartment building. He had been shot 20 times and died as a result. The police found 21 spent 40-caliber shell casings, all fired from the same gun.

The police noticed some fresh black graffiti on the wall of the apartment building. The graffiti read "Westside Wilmas X13" with the "es" in Westside crossed out. Rodriguez had black paint on his finger and on the web of his hand. A blue bandana was near Rodriguez's body. Blue is associated with the Westside Wilmas gang.

Police seized from Magallon's home a gray hooded sweatshirt with a "UCLA" logo on it and a blue bandana similar to the one found at the scene. Karina Romero was one of Ruvalcaba's neighbors. She heard shots and looked to see a

2

person wearing a hooded gray sweatshirt shooting. The person was wearing baggy clothes. Romero could not tell whether the person was male or female, but she thought the person was male. Romero could not see the shooter's face, but described the shooter as a "light-skinned" Hispanic. She could not accurately tell the shooter's height but guessed it was slightly less than five feet, nine inches. Magallon is five feet, three inches tall.

*Gang Evidence*

Los Angeles Police Officer Mark Maldonado testified as a gang expert. He said the Westside and Eastside Wilmas gangs were originally a single gang in Wilmington. In the 1980s they split into two separate gangs. The gangs are rivals. Magallon is and Rodriguez was a member of the Westside Wilmas gang, although Rodriguez's driver's license listed an address that fell within the Eastside territory.

Maldonado said violence within a gang often occurs. A gang member may fall "out of favor" for a number of reasons, including the failure to carry out an order. Punishment can include death. Where death is selected as a punishment, the gang member who carries out the punishment gains respect within the gang.

The alley where Rodriguez was shot is in Westside territory. Westside gang members often congregate there. The alley stems from a small neighborhood street, rather than a main thoroughfare. Anyone walking down the alley from Ronan Street would have to walk a long way, giving Westside members time to react. An Eastside Wilmas member would not walk down the alley because it is too dangerous and provides no element of surprise. An Eastside Wilmas member who wanted to shoot a Westside member would look for a target while driving major streets. A major street would allow for a quick escape.

3

*Defense*

Magallon lived with her parents, Sergio and Yolanda.[1] Two months prior to the shooting, the family moved from an apartment on Ronan to a home a mile and a half away.

Sergio testified Magallon left the apartment with a male friend at about 11:30 a.m. on the day of the shooting. She was wearing a gray UCLA sweatshirt with a hood. She returned to the apartment about 2:30 p.m. He remembers the time because he was watching a Cowboys and Redskins football game. He said the game began at 1:00 p.m. After Magallon returned, she relaxed at the apartment and had something to eat. On cross-examination, he was shown a football schedule and admitted the Cowboys game started at 10:00 a.m.

Larry Degroat testified he picked up Magallon at her home on the day of the shooting. They went to his house. She was at his house from 11:00 a.m. to 3:00 or 4:00 p.m. They watched a Raiders football game and some movies. She walked home. He did not give her a ride home because the mother of his children took the car to go shopping.

On cross-examination, Degroat admitted that he and Magallon were members of the Westside Wilmas gang. Degroat also admitted he originally told the police Magallon was not at his home on the day of the shooting. He also admitted he changed his story and told police she was at his home and he gave her a ride home after sunset.

Martin Flores testified as a gang expert. Flores said that in the four months prior to the shooting, there were three instances where a suspected Eastside gang member shot someone who was a member or associate of the Westside gang. Rodriguez was a Westside gang member who was shot in the heart of Westside territory. The graffiti Rodriguez sprayed, with the "es" crossed out, was a sign of

---

[1] We refer to Magallon's parents by their first names to avoid confusion, not out of disrespect.

disrespect for the Eastside gang.  Flores acknowledged, however, that disputes arise within a gang and gang members will shoot members of their own gang, including westsiders shooting westsiders.

## DISCUSSION

## I.

Magallon contends the trial court erred in excluding evidence that the gun used to shoot Rodriguez had been used in a prior incident.

Nine days prior to the Rodriguez shooting, two Hispanic men were asked to leave a party at the home of Matthew Elizarraraz because they were not invited.  After the men left, they shot at the house.  A woman associated with the Westside Wilmas gang was wounded.  She was unable to identify or describe the shooter.  At the time of Magallon's trial, the men had not been identified.  Ballistics tests showed the shots were fired from the same gun that was used to shoot Rodriguez.

The trial court excluded the evidence under Evidence Code section 352.  The court found the evidence would create "another trial" and was likely to confuse the jury.

Magallon argues the evidence is relevant to show that an Eastside Wilmas gang member used the same gun to shoot at a Westside Wilmas gang member.  Thus showing Rodriguez was shot by an Eastside gang member.

But it was unknown who fired the shots in the prior incident. Magallon could not show it was an Eastside Wilmas gang member.

Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

5

Given that the perpetrators of the prior shooting were unknown, the court was well within its discretion in concluding the probative value of the evidence is substantially outweighed by the undue consumption of time and the danger of confusing the jury.

## II.

Magallon contends her counsel provided ineffective assistance when he failed to object to hearsay statements or request a limiting instruction.

At trial, the People introduced portions of a videotaped interrogation Police Officers Fernando Rivas and Detective David Alvarez conducted with Degroat. A transcript of a portion of the interrogation follows:

"ALVAREZ: "We arrested your friend Bash [Magallon] yesterday and she told us a lot so I need you to tell me what happened on Sunday. [¶] . . . [¶]

"RIVAS: Did you see her at all on Sunday?

"LD: No, I was at the house with my daughter. [¶] . . . [¶]

"RIVAS: That's not what she told us.

"ALVAREZ: That's not what she told us.

"RIVAS: She told us you picked her up[.]

"RIVAS: How did you guys end up on Ronan Street?

"LD: I was never near Ronan Street.

"RIVAS: That's not the answer.

"LD: She lives over there on Avalon.

"RIVAS: I know where she lives.

"LD: But I didn't go on Ronan Street.

"RIVAS: I know she was on Ronan Street.

"LD: I didn't go near Ronan Street.

"RIVAS: That's not what she told us.

"LD: I was nowhere near there.

"RIVAS: She was with you. She said you were with her.

6

"LD:  I was nowhere near there[.]

"RIVAS:  Why would she say that?

"RIVAS:  The incident that happened on Ronan happened in between that time.

"LD:  But that has nothing to do with me because I was nowhere around there.

"RIVAS:  That's not what Misty's telling us.

"LD:  Well --

"RIVAS:  Why would she say that?  [¶] . . . [¶]

"RIVAS:  Larry, listen to me, listen to me.  You guys went somewhere, you went to Ronan.

"LD:  I didn't go to Ronan.

"RIVAS:  Well that's what she's telling me and I know she was there[.]  [¶] . . . [¶]

"LD:  I'm not lying.

"RIVAS:  Yes you are, because I have people that ID her[] there [*sic*] wearing the same thing you're telling me she's wearing, the same thing we found at her house, the same thing that she told us she was wearing. [¶] . . . [¶]

"RIVAS:  I know for a fact Misty went to Ronan and shot Rooster [Rodriguez].

"ALVAREZ:  [We] have people that positively identify[] her as being there, as her shooting[.]

"RIVAS:  Because we already, we already know who had the gun, but listen --

"LD:  I was nowhere near there.

"RIVAS:  -- listen, we know you were with her --

7

"LD: -- yeah and I dropped her off --

"RIVAS: And you're not accounting for time, I believe you. I never said that you dropped her off at your house because you told us you picked her [*sic*] and she told us that you picked her up and you dropped her off but you're leaving out the parts in the middle. [¶] . . . [¶]

"RIVAS: . . . I know for a fact she was on Ronan. [¶] . . . [¶]

"RIVAS: I already told you why, because she claimed you picked her up with [*sic*] is true. Said that she was with you on Sunday, which is true. [¶] . . . [¶]

"RIVAS: But you put Misty with you, Misty puts herself with you but we know, Misty was on Ronan. We know that for a fact.

Magallon argues the videotaped interview led the jury to believe she admitted to the police she was on Ronan when Rodriguez was shot; several witnesses identified her as the shooter; and the police had evidence that caused them to know she was the shooter. She claims the statements were hearsay and not relevant.

A defendant claiming ineffective assistance of counsel has the burden of showing counsel's representation fell below an objective standard of reasonableness, and but for counsel's unprofessional errors, the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mayfield* (1993) 5 Cal.4th 142, 185.) Where the record does not show why defense counsel acted or failed to act in a professional manner, the conviction must be affirmed unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation. *(People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) The prejudice prong requires the defendant to show but-for

8

counsel's errors there is a reasonable probability the defendant would have obtained a more favor result.  (*In re Wilson* (1992) 3 Cal.4th 945, 950.)

The videotape was admitted for the prior inconsistent statement Degroat made during the interview.  (Evid. Code, §§ 770, 1235.)  The words spoken by the officers were admitted for the non-hearsay purpose of giving context to Degroat's responses.  (*People v. Maciel* (2013) 57 Cal.4th 482, 524.)  The failure to object to those portions of the interview that were consistent with Degroat's testimony could have been tactical in that it bolstered his credibility.  (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 491.)  Thus counsel's representation was not deficient for failing to object to the admission of the videotape.

Magallon also contends her counsel's performance was deficient for failing to request an instruction that the officer's words could not be considered for the truth of the matter.  But any such failure was harmless.

Ruvalcaba identified Magallon as the shooter.  She was not a stranger.  Ruvalcaba had seen her frequently in the area prior to the shooting.  The shooting occurred in daylight and she was only 20 feet from him.  Ruvalcaba also identified Magallon in a photographic lineup.  He had no ulterior motive for identifying her.  There is no reasonable doubt the jury would have convicted Magallon on Ruvalcaba's identification alone.

Second, the prosecutor did not argue that the jury should consider the officer's statements for the truth of the matter asserted.  Nor did the prosecutor tell the jury that Magallon made admissions to the police.

Finally, Magallon's defense was weak.  Her alibi witnesses were not credible.  Her father testified Magallon was home by 2:30 on the afternoon of the shooting.  He based his time estimate on the Dallas versus

9

Washington football game. He said the game started at 1:00 p.m. But the schedule showed the game started at 10:00 a.m. Degroat, the other alibi witness, changed his story so often he lacked any credibility. Magallon's other defense was that she would not shoot a member of her own gang. But Magallon's own gang expert acknowledged gang members sometimes shoot members of their own gang, including Westsiders shooting Westsiders.

### III.

Magallon contends the trial court erred in allowing a videotape of Ruvalcaba's statement to the police to be played for the jury.

One day after the shooting, Ruvalcaba participated in a videotaped interview with the police. During the interview, he said he saw Magallon "while the gunshots were going." At trial, Ruvalcaba testified he did not hear gunshots while he was standing at the window. Over Magallon's objection, the court allowed the prosecutor to play the videotaped interview to the jury as a prior inconsistent statement.

Magallon argues the existence of a single prior inconsistent statement does not allow admission of the entire interview. (Citing *People v. Riccardi* (2012) 54 Cal.4th 758, 803.)

Assuming it was error to admit the videotape at that point in the trial, the error was harmless. Later, on cross-examination, Ruvalcaba stated he was not 100 percent sure Magallon was the shooter, but it is fair to say he saw someone who looked like her. The entire videotape would have been admissible as a prior inconsistent statement to show that shortly after the shooting Ruvalcaba was quite sure Magallon was the shooter.

In any event, the videotape simply confirmed Ruvalcaba's testimony on direct examination. Cumulative statements that repeat facts

10

established by other means are not prejudicial.  (*People v. Blacksher* (2011) 52 Cal.4th 769, 818, fn. 29.)  Nor are the cumulative errors here prejudicial. Magallon received a fair trial.

IV.

Finally, the parties agree Magallon is entitled to two additional days of custody credit.

We modify the judgment to add two additional days custody credit and direct the superior court to amend the abstract of judgment accordingly and forward a certified copy to the Department of Corrections and Rehabilitation. The judgment is affirmed in all other respects.

NOT TO BE PUBLISHED.


GILBERT, P. J.


We concur:


YEGAN, J.


PERREN, J.

11

Tomson T. Ong, Judge

Superior Court County of Los Angeles

_____

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Michael C. Keller, Deputy Attorney General, for Plaintiff and Respondent.